IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION

| | |
|---|---|
| LIBERTY PATENTS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>Analog Devices, Inc.,<br><br>Defendant. | CIVIL ACTION NO. 6:21-cv-60-ADA<br><br>**JURY TRIAL DEMANDED** |
| LIBERTY PATENTS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>Lattice Semiconductor Corporation,<br><br>Defendant. | CIVIL ACTION NO. 6:21-cv-61-ADA<br><br>**JURY TRIAL DEMANDED** |

**LIBERTY PATENTS' OPENING CLAIM CONSTRUCTION BRIEF**

## TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................1

II. TECHNOLOGY BACKGROUND ........................................................................1

III. LEGAL STANDARDS ........................................................................................4

IV. AGREED CLAIM TERMS ..................................................................................5

V. DISPUTED CLAIM TERMS (NON-MEANS-PLUS-FUNCTION)...................................5

A. "apparatus".................................................................................................. 5

B. "output clock signal[s]" / "output signals" ....................................................... 8

C. "control signal is configured" ........................................................................ 10

D. "minimize a difference in delay between said plurality of output clock signals" ...... 11

1. Defendants' proposed language "lowest possible value" is unhelpful and contrary to the intrinsic and extrinsic evidence ............................................... 12

2. The word "minimize" does not render the claim term indefinite ..................... 13

E. "wherein said first control signal is configured in response to selection of said output signals from a group consisting of a round-robin, a binary weighting, and a post-manufacture criterion" ........................................................................ 15

VI. DISPUTED CLAIM TERMS (MEANS-PLUS-FUNCTION)...........................................15

A. "means for generating said output clock signals in response to a reference clock signal and a feedback signal"........................................................................ 15

B. "means for selecting one of said output clock signals as said feedback signal in response to a control signal"........................................................................ 18

C. "means for generating said plurality of output clock signals and a control signal in response to a reference clock signal and a feedback signal" ................................. 19

VII. CONCLUSION........................................................................................20

## EXHIBIT LIST

| Exhibit No. | Exhibit Description |
|---|---|
| 1 | U.S. Patent No. 6,608,530 |
| 2 | U.S. Patent No. 6,734,740 |
| 3 | Excerpts from Defendants' Preliminary Invalidity Contentions |
| 4 | Excerpts from *The Authoritative Dictionary of IEEE Standards Terms* (7th ed. 2000) |
| 5 | Excerpts from the *Modern Dictionary of Electronics* (7th ed. 1999) |
| 6 | Excerpts from Robert C. Faber, *Landis on Mechanics of Patent Claim Drafting* § 14 (1998) |
| 7 | Excerpts from *The American Heritage Dictionary of the English Language* (1981) |
| 8 | Excerpts from the *IBM Dictionary of Computing* (10th ed. 1994) |
| 9 | Excerpts from *The Illustrated Dictionary of Electronics* (8th ed. 2001) |
| 10 | Excerpts from the *Oxford Dictionary of Computing* (6th ed. 2008) |
| 11 | Excerpts from the *McGraw-Hill Dictionary of Electrical & Electronic Engineering* (1984) |

## I. INTRODUCTION

Plaintiff Liberty Patents accuses Defendants Lattice Semiconductor and Analog Devices of infringing U.S. Patent Nos. 6,608,530 ("the '530 Patent") and 6,734,740 ("the '740 Patent") (collectively, "the asserted patents"). Both are part of the same patent family and share a common specification.[1]

The parties agree on the proper construction of one claim term and dispute the constructions of eight claim terms. The claim terms that Defendants seek to construe have a plain and ordinary meaning readily understood by persons of ordinary skill in the art, and there is no evidence of lexicography or disclaimer. Yet Defendants insist on self-serving constructions that contradict both the specification and extrinsic evidence. Defendants also assert that certain claim limitations are indefinite. But their invalidity and claim-construction disclosures do not state proper indefiniteness arguments, and fail to identify any expert testimony or other extrinsic evidence—much less proof that establishes indefiniteness by clear and convincing evidence.

The Court should thus adopt Liberty Patents' proposed constructions and reject Defendants' proposed constructions.

## II. TECHNOLOGY BACKGROUND

The asserted patents relate to zero delay buffer (ZDB) technology for producing multiple output clock signals with minimized and predicted delay. Clock signals are periodic signals used for synchronizing events in electronic devices.[2] A ZDB circuit generates multiple output clock signals, which are derived from a single reference clock signal (also known as a reference input) through a circuit known as a phase locked loop (PLL). *See* 1:14–34; 1:66–2:14. The output clock signals are then distributed throughout the electronic system. ZDB circuits are currently used in the timing technology device market, including for such applications as personal computers, modems, small office/home office network routers and hubs, digital video disks, and

[1] For simplicity, unless otherwise noted, all "xx:yy" citations are to the specification of the '530 patent.

[2] Ex. 4, *The Authoritative Dictionary of IEEE Standards Terms* (7th ed. 2000), at 177.

home video games.[3]

The asserted patents disclose a ZDB circuit configured to approximate a closed-loop system—that is, a system where the "output is fed back for comparison with the input for the purpose of reducing any difference between input command and output response."[4] At the time of the invention, conventional ZDB circuits produced multiple output clock signals that had an undesirable phase difference (or delay) between the reference clock input and the output clock signals. *See* 1:14–22; 1:35–65. Such conventional ZDB circuits included a feedback mechanism, where one of the output clock signals ("CLKa") would be set as the feedback clock signal ("FEEDBACK"), which would be used as a second input to the PLL circuit (12), along with the reference input ("REF_IN"), as shown below in Figure 1. *See* 1:37–47.



FIG. 1

The specification explains the benefits of using one of the output clocks as feedback:

> When feedback is introduced, the ZDB circuit becomes a closed-loop system. External factors such as temperature, supply voltage and output loading variations become part of the error term in the feedback path that is compensated or cancelled in the ZDB circuit. Feedback mitigates external effects and ensures high predictability and accuracy in the production of the output signal edges in the ZDB circuit.

2:23–30. But conventional ZDB circuits were implemented with only "one closed-loop path (i.e., the signal FEEDBACK via only the signal CLKa to the phase detector 20)," such that the "remaining output signals CLKb–CLKn operate in lock-step, ***but are not part of the closed loop***

[3] http://investors.cypress.com/node/7026/html.

[4] Ex. 5, *Modern Dictionary of Electronics* (7th ed. 1999), at 124.

***system***." 2:55–59 (emphasis added). As a result, the output signals that were not part of the feedback process were subject to parametric element variations, which meant a greater difference in the delay for each of those output clock signals relative to the signal REF_IN. *See* 2:59–65.

The preferred embodiments of the asserted patents address this issue by causing "***all of the output clock signals CLKa-CLKn to participate in the feedback process***," as shown below in Figure 3. 6:18–29 (emphasis added); *see also* 3:59–4:4.




FIG. 3

In other words, while all but one of the output clock signals operate in an open loop in the described prior art systems, the invention discloses a ZDB circuit where all of the output clock signals operate in an approximate closed-loop system. *See* 10:14–32. This not only had the benefit of mitigating the "effects of independent loading, temperature variations, etc." (10:20–32), but the unique and novel feedback implementation also reduced the overall delay of the output clock signals relative to the input reference:

> The circuit 100 may be configured to control the generation of the signals CLKa-CLKn such that ***a difference between the respective delays of the signals CLKa-CLKn is minimized relative to the signal REF_IN*** (e.g., the delays of the signals CLKa-CLKn may be ***substantially equal***). An edge of the signals CLKa-CLKn may have a zero (or fixed interval) delay relative to an edge of the signal REF_IN. The delay of the signals CLKa-CLKn may be predicted.

4:17–34 (emphasis added).

Another preferred embodiment includes a bank of divider circuits that are used to

generate the output clock signals (DIV_CLKa–DIV_CLKp), all of which similarly participate in the feedback process, as shown below in Figure 4. *See* 7:36–8:8.




FIG. 4

Claim 1 of both patents is illustrative of the claimed subject matter:

**’530 Patent**

1. An apparatus comprising:

a first circuit configured to present a plurality of output clock signals in response to a reference clock signal and a feedback signal; and

a second circuit configured to select one of said plurality of output clock signals as said feedback signal in response to a first control signal, wherein said first control signal is configured to minimize a difference in delay between said plurality of output clock signals.

**’740 Patent**

1. An apparatus comprising:

a first circuit configured to present a plurality of output clock signals and a first control signal in response to a reference clock signal and a feedback signal; and

a second circuit configured to select one of said plurality of output clock signals as said feedback signal in response to said first control signal.

## III. LEGAL STANDARDS

The “words of a claim are generally given their ordinary and customary meaning,” which is simply “the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention . . . .” *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–13 (Fed. Cir. 2005) (en banc) (internal quotes omitted). “The ‘only two exceptions to [the] general

rule' that claim terms are construed according to their plain and ordinary meaning are when the patentee (1) acts as his/her own lexicographer or (2) disavows the full scope of the claim term either in the specification or during prosecution.'" *True Chem. Solns., LLC v. Performance Chem. Co.*, No. 7:18-cv-78-ADA, Dkt. 64, at 3 (W.D. Tex. Sept. 25, 2019) (quoting *Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)).[5]

## IV. AGREED CLAIM TERMS

The parties agree on the construction of the following claim term:

| Claim Term, Phrase, or Clause | Agreed Construction |
|---|---|
| "[apparatus / method] for minimizing a difference in delay between a plurality of output clock signals"<br>(Claims 14, 15 of the '530 Patent)<br>(Claims 15, 16 of the '740 Patent) | The preambles are limiting. |

## V. DISPUTED CLAIM TERMS (NON-MEANS-PLUS-FUNCTION)

### A. "apparatus"

| Claim Term, Phrase, or Clause | Liberty's Proposed Construction | Analog's Proposed Construction | Lattice's Proposed Construction |
|---|---|---|---|
| "apparatus"<br>(Claims 1, 2, 3, 5, 7, 9, 11, 14 of the '530 Patent)<br>(Claims 1, 2, 3, 4, 6, 7, 9, 12, 15 of the '740 Patent) | Part of a non-limiting preamble; otherwise, plain and ordinary meaning | plain and ordinary meaning | "Circuitry that generates and distributes output clock signals to a target system." |

The parties dispute whether this term is limiting in the preamble and whether it requires construction otherwise.[6] Lattice alone seeks to add structural limitations to this generic expression, apparently reading in language from the specification used to describe a preferred

[5] Liberty is foregoing a lengthy legal recitation based on the Court's guidance that it "is very familiar with the law of claim construction" and would have the parties "instead focus on the substantive issues."

[6] Analog has indicated that it is not seeking construction of this claim term and "output clock signals" because it does not believe their construction is relevant to any issues in its case.

embodiment. The Court should, however, construe this term to be part of a non-limiting preamble, and to otherwise bear its plain and ordinary meaning, which—in the context of patent law—is a legal term-of-art that does not limit the scope of the claimed invention.

First, the word "apparatus" does not provide structure to the claim limitations at issue here. Nearly every occurrence of "apparatus" is in the preamble of both patents without recitation of any structure.[7] Claim 1, the only independent claim at issue here, recites "[a]n apparatus comprising" and nothing more. The remaining claims all depend on claim 1 and only recite "[t]he apparatus according to claim . . . ."[8] With that context, "apparatus" cannot provide structure to the claimed invention. The Federal Circuit has made clear that "[i]f the preamble adds no limitations to those in the body of the claim, the preamble is not itself a claim limitation and is irrelevant to proper construction of the claim." *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000) (concluding that the "phrase 'control apparatus' in the preamble merely gives a descriptive name to the set of limitations in the body of the claim that completely set forth the invention. Its use does not limit the claims … to a control apparatus that is separate from the machine tool."). Nothing in the claims, the specification, or the prosecution history indicates an intent of the patentees to use the term "apparatus" to limit the scope of the claimed invention.[9] *See Thorner*, 669 F.3d at 1367 (emphasizing that "[t]he patentee is free to choose a broad term and expect to obtain ***the full scope of its plain and ordinary meaning***, unless the patentee explicitly redefines the term or disavows its full scope") (emphasis added).

[7] The word "apparatus" appears in claims 1–14 of the '530 Patent in the preamble, and only twice in the body (claims 7 and 11). It appears in claims 1–15 of the '740 Patent in the preamble, and only twice in the body (claims 9 and 12). The parties have already agreed that the preambles for claim 14 of the '530 and claim 15 of the '740 Patent are limiting.

[8] The dependent claims that recite "apparatus" in the body of the claims similarly do not provide any additional structure. Claim 7 of the '530 patent and claim 9 of the '740 Patent employ "apparatus" only to describe the various post-manufacture criteria without adding any structure. Claim 11 of the '530 patent and claim 12 of the '740 Patent recite only "wherein said apparatus comprises," which again, does not add any structure to the claims.

[9] The patent statute defines a "claimed invention" as "the subject matter defined by a claim in a patent or an application for a patent." 35 U.S.C. § 100(j).

Lattice's proposed construction is a transparent attempt to import language from the specification into the claims. Lattice has essentially cut-and-pasted a portion of the specification as its proposed "apparatus" construction:

> Since the ZDB 10 replicates the reference clock frequency input (i.e., REF_IN), multiple instantiations of the input clock are generated n times (i.e., ***the output clock signals CLKa-CLKn) to be distributed throughout the target system*** where the circuit 10 is implemented.

1:66–2:3 (emphasis added). But "it is improper to read limitations from a preferred embodiment described in the specification—even if it is the only embodiment—into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004).

Second, "[t]he word 'apparatus' is used generically to denote various machines and devices, including electrical circuits, computer related apparatus, hydraulic devices, anything mechanical or electrical having cooperating parts that accomplish some useful result, usually some act or operation on itself or on an article or workpiece."[10] It is "frequently used by patent practitioners as a sort of ***generic expression*** covering machines or other mechanical devices that perform operations on workpieces . . . ."[11] In fact, a generic use of "apparatus" in the claims—similar to its use in the asserted patents—was recently confirmed by the ITC not to be limiting:

> As with "device" in the 100 patent, ***'an apparatus'*** in claim 1 ***offers no meaningful structural guidance, other than the claimed invention is a tangible item rather than a method or a composition of matter***. Its use within all other claims in the patent (there are no other independent claims) is ***merely redundant introductory language, rather than a necessary antecedent basis***."

*In re Certain Mobile Devices with Multifunction Emulators*, Inv. No. 337-TA-1170, at 120–21(USITC Mar. 16, 2021) (emphasis added); *see also id*. ("'Apparatus' is by no means 'necessary to give life, meaning, and vitality' to any claim of the 631 patent, and is therefore not limiting."). In other words, the term "apparatus" is used to identify the type of device being

---

[10] Ex. 6, Robert C. Faber, *Landis on Mechanics of Patent Claim Drafting* § 14 (1998).

[11] *See supra* note 10, Faber at § 15 (emphasis added).

claimed—it does not provide structure in addition to the structure described in the body of the claims.[12]

### B. "output clock signal[s]" / "output signals"

| Claim Term, Phrase, or Clause | Liberty's Proposed Construction | Analog's Proposed Construction | Lattice's Proposed Construction |
|---|---|---|---|
| "output clock signal[s]" / "output signals"<br>(Claims 1, 2, 3, 5, 9, 11, 14, 15, 16 of the '530 Patent)<br>(Claims 1, 2, 3, 4, 6, 7, 12, 15, 16, 17, 20 of the '740 Patent) | plain and ordinary meaning | plain and ordinary meaning | "A clock signal buffered as output at a pin." |

Only Lattice contends that this term requires construction. While the parties do not dispute the meaning of clock signal, Lattice insists that the term "output clock signals" is limited to only "clock signals" that are modified in a certain way ("buffered") and output from a certain place ("at a pin"). The Court should reject Lattice's proposal and allow the term to bear its plain and ordinary meaning.

Persons skilled in the art would readily understand the meaning of "output clock signals" or "output signals" (used interchangeably in the claims) without further construction. A "clock signal," for example, is "[a] periodic signal used for synchronization and for measuring intervals of time."[13] "Output" means "[e]nergy or information delivered by a circuit, device, or system."[14]

[12] The PTO's Manual of Patent Examining Procedure ("MPEP") has a section devoted to functional language in "Apparatus and Article Claims." *See* MPEP § 2114 ("[A]pparatus claims cover what a device *is*, not what a device *does*." (quoting *Hewlett-Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1469 (Fed. Cir. 1990) (emphasis in original)).

[13] Ex. 8, *IBM Dictionary of Computing* (10th ed. 1994), at 108; *see also* Ex. 4, *The Authoritative Dictionary of IEEE Standards Terms* (7th ed. 2000), at 177 ("A periodic signal used for synchronizing events.").

[14] Ex. 9, *The Illustrated Dictionary of Electronics* (8th ed. 2001), at 504; *see also* Ex. 10, *Oxford Dictionary of Computing* (6th ed. 2008), at 363 ("A signal that is obtained from an electrical circuit, such as a logic circuit" or "[t]o produce a result or signal"); Ex. 11, *McGraw-Hill Dictionary of Electrical & Electronic Engineering* (1984), at 307 ("The current, voltage,

Thus, an "output clock signal" includes a clock signal that is delivered by, or obtained from, a circuit, device, or system. Lattice's proposed construction is overly limiting because it would require "an output clock signal" to be (1) buffered and (2) at a pin—neither of which is part of the term's ordinary meaning or required by the intrinsic evidence. *See 3M Innovative Props. Co. v. Tredegar Corp.*, 725 F.3d 1315, 1329 (Fed. Cir. 2013) (explaining that when a claim term has an ascertainable ordinary meaning, "our cases do not support prescribing a more particularized meaning unless a narrower construction is required by the specification or prosecution history.").

The specification explains that an "output clock signal" need not be buffered[15] nor output at a pin. For example, the specification consistently refers to the signal that is output from circuit 112 (PLL) as an output clock signal (i.e., CLKa): "The circuit 112 may also have an input 132 that may receive the signal FEEDBACK and ***an output 134 that may present the signal CLKa***." *See* 5:13–15 (emphasis added). Later, the specification makes clear that CLKa is an output clock signal: "The present invention may comprise a method and/or architecture wherein all of the ***output clock signals CLKa-CLKn*** may participate in the feedback process and only one PLL circuit 112 is implemented." 6:5–11 (emphasis added); *see also* 4:21–22 ("The signal CLK may be a ZDB output clock signal."). Thus, CLKa is an "output clock signal" that is first presented at output 134 of circuit 112—***before*** buffer circuits 114*a*–114*n* and ***before*** pins 106*a*-106*n*. *See, e.g.*, Figs. 3, 4. The preferred embodiments illustrated in Figures 4 and 5 also make this clear because in both embodiments, the output clock signals that are ultimately presented at the pins

power, driving force, or information which a circuit or device delivers" or "[t]erminals or other places where a circuit or device can deliver current, voltage, power, driving force, or information.").

[15] The specification expressly identifies a buffered "output clock signal" by using "buffered" as an adjective, which indicates that an "output clock signal," by itself, is not buffered. *See* 2:44–46 ("Some applications of ZDB type circuits require a known positive delay between reference and ***buffered output clock signals***.") (emphasis added); 10:20–23 ("The present invention may be configured such that all of the ***buffered output signals CLKa-CLKn*** are multiplexed to approximate a closed-loop system.") (emphasis added). Some technical dictionaries also include a separate definition for "buffered output." *See, e.g.*, Ex. 9, *The Illustrated Dictionary of Electronics* (8th ed. 2001), at 89.

(e.g., DIV_CLKa) are initially output from divider circuits 180*a*–180*p* as output clock signals—both before buffer circuits 114*a*-114*n* and before pins 106*a*-106*n*.

Even more, claim 16 of the ’530 Patent and claim 17 of the ’740 Patent (which are similar) show that the clock signal output from PLL circuit 112—which happens before the buffers and not at a pin—is an “output clock signal.” Both claims include two steps—the first generates a “first . . . output clock signal” and the second generates a “remainder of said . . . output clock signals.” In all three embodiments (Figs. 3, 4, 5), CLKa is the “output clock signal” used to generate the remainder of the output clock signals, and the specification makes clear (as shown above) that CLKa is generated by the PLL before the buffer circuits or the pins. *See Phillips*, 415 F.3d at 1314 (“[T]he context in which a term is used in the asserted claim can be highly instructive.”).

Lattice’s proposed construction should thus be rejected because it seeks to limit “output clock signal” to one that is buffered and that is output at a pin—requirements that contradict both the plain and ordinary meaning of that term and its usage in the specification and claims.

### C. “control signal is configured”

| Claim Term, Phrase, or Clause | Liberty’s Proposed Construction | Defendants’ Proposed Construction |
|---|---|---|
| “control signal is configured”<br>(Claims 1, 5 of the ’530 Patent)<br>(Claim 6 of the ’740 Patent) | plain and ordinary meaning | Indefinite. |

Defendants both assert that this term is indefinite, but the Court should construe the term to have its plain and ordinary meaning. The term “configured to” is a term familiar to both laypersons and those of ordinary skill in the art, and generally means “[t]o design, arrange, set up, or shape with a view to specific applications or uses.”[16] So the term “control signal is configured” needs no construction. *See, e.g.*, *Invensys Sys., Inc. v. Emerson Elec. Co.*, 63 F.

[16] Ex. 7, *The American Heritage Dictionary of the English Language* (1981), at 395.

Supp. 3d 663, 671 (E.D. Tex. 2014) (refusing to construe the term "configured to" because it is "readily accessible to the jury," and further rejecting defendants' indefiniteness argument).

Defendants do not offer an alternative construction for this term. Instead, they argue that it is indefinite because the "claim language does not describe how to go about 'configur[ing]' a 'control signal.'" Ex. 3, Defs.' Prelim. Inv. Contentions, at 28. But the indefiniteness test is "whether the claim 'inform[s] those skilled in the art about the scope of the invention with reasonable certainty"—not whether those skilled in the art would know "how to go about" configuring a control signal. *See Nevro Corp. v. Boston Sci. Corp.*, 955 F.3d 35, 39–41 (Fed. Cir. 2020) (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898 (2014)) (rejecting argument that "configured to" was indefinite). Defendants' "arguments appear to be based on the wrong legal standard, i.e., written description or enablement as opposed to indefiniteness." *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1340 (Fed. Cir. 2014); *TQ Delta, LLC v. 2Wire, Inc.,* 373 F. Supp. 3d 509, 523–24 (D. Del. 2019) (holding that whether specification showed "how" to achieve claimed function was "not an issue of whether a person of ordinary skill in the art would understand the claim scope," and that relevant term was not indefinite).[17]

**D. "minimize a difference in delay between said plurality of output clock signals"**

| Claim Term, Phrase, or Clause | Liberty's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "minimize a difference in delay between said plurality of output clock signals"<br>(Claim 1 of the '530 Patent)<br>(Claim 6 of the '740 Patent) | plain and ordinary meaning | "Cause the delays among the output clock signals to have the lowest possible value."<br>Otherwise, indefinite. |

The Court should construe this term to have its plain and ordinary meaning. Defendants offer an alternative construction that fails to clarify any purported ambiguity, and Defendants' conditional indefiniteness argument collapses when the specification's guidance is considered.

[17] Defendants' position also suffers from the absence of any evidence regarding the ordinary artisan's understanding of the claims. *See* section V.D.2, *infra*.

### 1. Defendants' proposed language "lowest possible value" is unhelpful and contrary to the intrinsic and extrinsic evidence

The term "minimize" in the context of the claims and specification would be readily understood by both laypersons and those of ordinary skill in the art, and is used consistent with its broad ordinary meaning. So this term needs no construction.

Defendants' proposed construction of "minimize" as "lowest possible value" is overly restrictive and disregards commonly used definitions of that term that align with how it is used in the specification. While "minimize" can mean "to reduce to the smallest possible amount, extent, size, or degree," another common definition is "to reduce."[18] The Usage Note for "minimize" indicates that the "the verb *minimize* is often used to mean 'to reduce,' an extension of its strict etymological sense of 'to reduce to the smallest possible level.'"[19] In fact, courts have construed "minimize" to mean "to reduce" in similar contexts. In *Plastipak Packaging v. Niagara Bottling, LLC*, the district court rejected a definition similar to the one Defendants propose in favor of the definition "to reduce."[20] No. 1 :17-cv-1463 (AJT/MSN), slip op. at 24–25 (D. Va. Aug. 23, 2018). The district court rejected Plastipak's attempt to define "minimize" "in terms of a reduction to the lowest possible size or degree." *Id*. at 24. The court explained that "Plastipak's construction would introduce a vague, imponderable, and endlessly debatable term, 'as much as possible,' without any objective measure within the context of the covered invention." *Id*. Further, the court noted that even though Plastipak's proposed definition was based on "one generally accepted definition of 'to minimize,' ***there are other recognized definitions of 'to minimize' that designate its meaning as simply meaning 'to reduce***.'" *Id*. (citing merriam-webster.com ("one definition of 'to minimize' means 'to reduce ...'")). The court ultimately concluded that Niagara's construction, which simply referred "to a reduction in

[18] Ex. 7, *The American Heritage Dictionary of the English Language* (1981), at 1150.

[19] *See supra* note 12 at 1149–50 (emphasis in original). The Usage Note also explains that the related adjective "*minimal* . . . has come to be used to refer simply to a small amount" and this usage "appears to be well established." *Id*. (emphasis in original).

[20] The term for construction was "wherein weight of the container is minimized."

weight," "appear[ed] more consistent with the specification . . . , which the claim language appear[ed] intended to reflect." *Id.* at 24–25.

Here, the specification does not use the term "minimize" to refer to achieving the "lowest possible value," as Defendants say the term requires:

> [C]ircuit 100 may be configured to control the generation of the signals CLKa-CLKn such that ***a difference between the respective delays of the signals CLKa-CLKn is minimized relative to the signal REF_IN*** (e.g., the delays of the signals CLKa-CLKn may be ***substantially equal***).

4:26–31 (emphasis added). The specification is referring to ***reducing*** the difference in delay of the output clock signals—relative to the reference input signal—so that that difference is substantially equal; it does not require that the delay be as low as possible. In the context of the specification, therefore, the term "minimize" is used consistently with its broader meaning of "to reduce," not its narrower meaning of achieving the "lowest possible value." The Court should thus reject Defendants' attempt to unduly narrow this term. *See Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1377 (Fed. Cir. 2014) (holding that it was error to limit scope of "instruction" to require a statement in a "programming language," as this construction improperly adopted one narrow dictionary definition of the term while ignoring a second, broader, dictionary definition that appeared consistent with the term's usage in the specification).

**2. The word "minimize" does not render the claim term indefinite**

Defendants alternatively argue that the term is indefinite because "a POSITA would not understand what the 'minimizing' refers to, particularly when the 'difference in delay' must be 'between . . . signals.'" Ex. 3, Defs.' Prelim. Inv. Contentions, at 27. As explained above, this term—and particularly the word "minimize"—apprises those skilled in the art of the scope of the claimed invention with a reasonable degree of precision and particularity. *See generally Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 624 (Fed. Cir. 1985). Contrary to Defendants' argument, the specification provides clear and unambiguous guidance that this term refers to reducing the "difference in delay" between the output clock signals "relative to" the signal REF_IN. That is, each of the output clock signals (CLKa-CLKn), when

compared to the signal REF_IN, will have a difference in their respective delays. The specification explains that the invention may minimize (i.e., reduce) each of those differences such that the delays of the output clock signals are "substantially equal." 4:26–31.

Furthermore, Defendants' conditional indefiniteness argument is gutted by their failure to identify any evidence about how one skilled in the art would understand this claim term. "[T]he burden [i]s on [Defendants] to prove by clear and convincing evidence that a person of ordinary skill in the field of the invention" would not sufficiently understand the claimed invention's scope. *Elcommerce.com, Inc. v. SAP AG*, 745 F.3d 490, 505–06 (Fed. Cir. 2014), *vacated on other grounds*, 564 F. App'x 599 (Fed. Cir. 2014). But Defendants have identified no extrinsic evidence at all to show that this term would not be understood by artisans unless their construction were adopted. (Indeed, Defendants did not identify extrinsic evidence for ***any*** of their positions.) Whatever arguments Defendants may offer in their responsive brief to support their indefiniteness position, they will not be enough: "[a]ttorney argument is not evidence." *Id.* And "in the absence of evidence provided by technical experts" to establish indefiniteness, "there is a failure of proof." *Id.* (vacating ruling of indefiniteness where defendant "did not present evidence regarding the knowledge of persons of skill in the field of the invention."); *see also Fisher-Rosemount Sys. v. ABB Ltd.*, No. 4:18-cv-00178, 2019 U.S. Dist. LEXIS 214507, at *38 (S.D. Tex. Dec. 12, 2019) (holding that defendant failed to prove "indefiniteness by clear and convincing evidence" where it provided "nothing more than attorney argument to support its indefiniteness argument"); *Whirlpool Corp. v. Ozcan*, No. 2:15-cv-2103-JRG, 2016 U.S. Dist. LEXIS 179492, *11–*12 (E.D. Tex. Dec. 28, 2016) (holding that defendant failed "to meet the high burden necessary to establish that the relevant claims are indefinite" because it "relie[d] entirely on attorney argument based on the patent's intrinsic evidence").

So Defendants cannot meet their burden to show that this term is indefinite unless their construction is adopted, and the Court should reject Defendants' attempt to narrow its meaning.

### E. "wherein said first control signal is configured in response to selection of said output signals from a group consisting of a round-robin, a binary weighting, and a post-manufacture criterion"

| Claim Term, Phrase, or Clause | Liberty's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "wherein said first control signal is configured in response to selection of said output signals from a group consisting of a round-robin, a binary weighting, and a post-manufacture criterion"<br>(Claim 5 of the '530 Patent) | plain and ordinary meaning | Indefinite. |

The Court should construe this phrase to have its plain and ordinary meaning.

Defendants do not offer an alternative construction for this phrase. Instead, they repeat their flawed position for indefiniteness that they used for the "control signal configured" term. Defendants argue that the "claim language does not describe how to go about 'configur[ing]' a 'control signal' or how to 'select' an 'output signal[ ] from a group consisting of' the stated items." Ex. 3, Defs.' Prelim. Inv. Contentions, at 28. Again, if anything, Defendants' argument goes to enablement not indefiniteness. This phrase would be readily understood by a person of skill in the art. *See* section V.C, *supra*. Thus, the Court should give this phrase its plain and ordinary meaning.

## VI. DISPUTED CLAIM TERMS (MEANS-PLUS-FUNCTION)

### A. "means for generating said output clock signals in response to a reference clock signal and a feedback signal"

| Claim Term, Phrase, or Clause | Liberty's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "means for generating said output clock signals in response to a reference clock signal and a feedback signal"<br>(Claim 14 of the '530 Patent) | <u>Function</u>:<br>generating said output clock signals in response to a reference clock signal and a feedback signal<br><u>Structure</u>:<br>circuit 112 and circuits 114*a*–114*n*; or circuit 112 and | <u>Function</u>:<br>generating said output clock signals in response to a reference clock signal and a feedback signal<br><u>Structure</u>:<br>112 (including 140, 142, 144), 114a-n, optionally 170 |

| Claim Term, Phrase, or Clause | Liberty's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| | circuits 180*a*–180*p* or 180*a″*–180*p″*; and equivalents thereof | or 170″ (including 180a-p or 180″a-p″), 120, and 118, as arranged in Figs. 3, 4, or 5 |

The parties agree to this means-plus-function term's function and to some of its structure. The parties disagree about the full scope of the corresponding structure for the agreed function.

The Court should adopt Liberty's proposed structure because the specification describes those sets of circuits as distinct alternatives for performing the claimed function. The specification describes three preferred embodiments relevant to this function. Circuit 112 and circuits 114*a*–114*n* are corresponding structure for the first preferred embodiment; circuit 112 and circuits 180*a*–180*p* or 180*a″*–180*p″* are corresponding structure for the second and third embodiments. Although Defendants include each of those circuits in their proposed construction, they ignore differences in corresponding structure between alternative embodiments, and seek to add structures that are not linked to the claimed function in any embodiment. *See Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347 (Fed. Cir. 2015) (en banc in relevant portion) (explaining that the scope of a functional term governed by § 112, ¶ 6 is limited "to only the structure, materials, or acts described in the specification as corresponding to the claimed function and equivalents thereof.").

First, Defendants erroneously require that circuits 114*a*–114*n* always be part of the corresponding structure for this term. But although circuits 114*a*–114*n* are part of the structure that generates the output clock signals from the first preferred embodiment (*see* Fig. 3), they are not a required part of the structure for the second and third embodiments (*see* Figs. 4 and 5). All three embodiments show that circuit 112 (PLL circuit) generates one of the output clock signals (CLKa) in response to a reference clock signal and a feedback signal. To generate the remaining output clock signals, the first embodiment (circuit 100) uses circuits 114*a*–114*n*. 5:30–42. But in the second and third embodiments, circuits 114*a*–114*n* are not necessary structure to generate the output clock signals. Instead, the second and third embodiments include divider circuits

180*a*–180*p* and 180*a″*–180*p″*, respectively, to generate the output clock signals before they are received by circuits 114*a*–114*n*. 7:57–8:8 ("The circuits 180*a*–180*p* may be configured to generate the signals DIV_CLKa–DIV_CLKp in response to the signal CLKa."); *see also* 8:22–40 (describing circuits 180*a″*–180*p″* and generation of output clock signals DIV_CLKa–DIV_CLKp). Because circuits 114*a*-114*n* are not required to perform the claimed function in the second and third embodiments, they should not be part of the alternative structure that corresponds to those embodiments. *See Creo Prods., Inc. v. Presstek, Inc.*, 305 F.3d 1337, 1346 (Fed. Cir. 2002) (holding that proper application of § 112 ¶ 6 "generally reads the claim element to embrace distinct and alternative described structures for performing the claimed function").

Second, Defendants include circuits 118 (e.g., control circuit) and 120 (e.g., memory) in their construction, but those structures are not linked to the claimed function of this term. A "structure disclosed in the specification is 'corresponding' structure ***only if*** the specification or prosecution history ***clearly links or associates that structure to the function*** recited in the claim." *Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc.*, 248 F.3d 1303, 1311 (Fed. Cir. 2001) (emphases added). The function of ***circuit 118*** is to generate one or more control signals (e.g., CTRL, ENABLE) in response to a reference clock signal and a feedback signal (via one of the output clock signals). *See* 5:53–66 ("The circuit 118 may be configured to generate the signals ENABLE and CTRL in response to the signals REF_IN (via the signal CLKa) and ST_CTL."); 6:65–7:3 ("[C]ircuit 118 may be implemented as a counter circuit that is configured to generate the signal CTRL in response to counts of the signal REF_IN via the signal CLKa"); 8:29–34 (The circuit 118″ generally presents the signal CTL_DIVIDE in response to programming in the circuit 120 via the signal ST_CTL.). The function of ***circuit 120*** is to present the "signal ST_CTL … to the circuit 118 in response to programming in the circuit 120." *See* 5:66–6:4; *see also* 6:52–55 ("The circuit 120 may be programmed to present the signal ST_CTL …"); 7:4–8 ("[C]ircuit 120 may be programmed to present the signal ST_CTL using advanced techniques …"). But neither circuit 118 nor circuit 120 is linked to the claimed

function of "generating said output clock signals in response to a reference clock signal and a feedback signal." Therefore, those circuits are not part of the corresponding structure.[21]

### B. "means for selecting one of said output clock signals as said feedback signal in response to a control signal"

| Claim Term, Phrase, or Clause | Liberty's Proposed Construction | Defendants' Proposed Construction |
|---|---|---|
| "means for selecting one of said output clock signals as said feedback signal in response to a control signal"<br>(Claim 14 of the '530 Patent) | Function:<br>selecting one of said output clock signals as said feedback signal in response to a control signal<br>Structure:<br>circuit 116 and equivalents thereof | Function:<br>selecting one of said output clock signals as said feedback signal in response to a control signal<br>Structure:<br>116, 118, 120, as arranged in Figs. 3, 4, or 5 |
| "means for selecting one of said plurality of output clock signals as said feedback signal in response to said control signal"<br>(Claim 15 of the '740 Patent) | Function:<br>selecting one of said plurality of output clock signals as said feedback signal in response to said control signal<br>Structure:<br>circuit 116 and equivalents thereof | Function:<br>selecting one of said plurality of output clock signals as said feedback signal in response to said control signal<br>Structure:<br>116, 118, 120, as arranged in Figs. 3, 4, or 5 |

The dispute here involves two similarly worded terms. The parties agree on the terms' function and agree that their structure includes circuit 116. But the parties disagree about whether the terms' structure also includes circuits 118 and 120.

The Court should adopt Liberty's proposed structure (circuit 116 and equivalents thereof) because only circuit 116 is linked by the specification to performing the claimed function of "selecting one of said output clock signals as said feedback signal in response to a control

[21] Defendants also seek to limit the structure of each of the means-plus-function limitations to that depicted in the figures, ignoring alternative implementations provided in the detailed description. *See e.g.*, 4:43–67 (describing alternative structures for circuits 114, 116, 118, and 120); 7:57–8:8 (describing alternative embodiments of circuits 180*a*–180*p* from the ones shown in the figures). The language, "as arranged in Figs. 3, 4, or 5," should be rejected.

signal."[22] *See* 5:44–52 ("The multiplexer circuit 116 may be configured to select one of the signals CLKa–CLKn as the signal FEEDBACK in response to the signal CTRL."); *see also* 6:27–29; 7:25–29. Defendants again seek to add circuits 118 and 120, neither of which is linked to the claimed function. As shown above, the function of ***circuit 118*** is to generate one or more control signals (e.g., CTRL, ENABLE) in response to a reference clock signal and a feedback signal (via one of the output clock signals), and the function of ***circuit 120*** is to present the signal (e.g., ST_CTL) to circuit 118 in response to programming stored in circuit 120. *See* section VI.A above (citing 5:53–66, 6:65–7:3, 8:29–34 for circuit 118 and 5:66–6:4, 6:52–55, 7:4–8 for circuit 120). Because both 118 and 120 are linked to different functions—and not to the claimed function—they are not part of the corresponding structure for these terms.

### C. "means for generating said plurality of output clock signals and a control signal in response to a reference clock signal and a feedback signal"

| Claim Term, Phrase, or Clause | Liberty's Proposed Construction | Defendants' Proposed Construction |
| --- | --- | --- |
| "means for generating said plurality of output clock signals and a control signal in response to a reference clock signal and a feedback signal"<br><br>(Claim 15 of the '740 Patent) | <u>Function</u>:<br>generating said plurality of output clock signals and a control signal in response to a reference clock signal and a feedback signal<br><br><u>Structure</u>:<br>circuit 112, circuits 114*a*–114*n*, and circuit 118; or circuit 112, circuits 180*a*–180*p* or 180*a*″–180*p*″, and circuit 118; and equivalents thereof | <u>Function</u>:<br>generating said plurality of output clock signals and a control signal in response to a reference clock signal and a feedback signal<br><br><u>Structure</u>:<br>112 (including 140, 142, 144), 114a-n, 118, 120, and optionally 170 or 170″ (including 180a-p or 180″a-p″), as arranged in Figs. 3, 4, or 5 |

The parties agree on the function of this term and on some of the structure. But, as with the dispute in section VI.A, *supra*, the parties disagree about the full scope of the corresponding structure for the agreed function.

[22] The function for the "means for selecting" in the '740 Patent differs only slightly: "selecting one of ***said plurality of*** output clock signals as said feedback signal in response to ***said*** control signal." (emphasis added).

This "means for generating" limitation is similar to the one disclosed in claim 14 of the '530 Patent, except that it additionally requires generating ***a control signal*** in response to a reference clock signal and a feedback signal. As a result, the analysis from section VI.A above is relevant and incorporated here. The Court should adopt the overlapping, alternative structures that Liberty proposed in that section (circuit 112 and circuits 114*a*–114*n*; or circuit 112 and circuits 180*a*–180*p* or 180*a″*–180*p″*) as necessary to carry out the part of the claimed function that requires "generating said plurality of output clock signals." (Defendants' structure for both terms is the same—despite the additional functional limitation in this term—which is an additional reason why they are wrong.)

Liberty's proposal for this term adds circuit 118 to the structure proposed in section VI.A as structure linked to "generating . . . a control signal." *See* '740 Patent, 5:44–66 ("The multiplexer circuit 116 may be configured to select one of the signals CLKa-CLKn as the signal FEEDBACK in response to the signal CTRL. . . . In one example, the circuit 118 may be configured to generate the signals ENABLE and CTRL in response to an edge of the signal REF_IN (via the signal CLKa).").

Defendants agree that circuit 118 is corresponding structure, but contend that circuit 120 is also linked to the claimed function. It is not. Circuit 120 presents a signal ST_CTL to circuit 118—it is not linked to or associated with generating the control signal CTRL, as explained in the previous section. *See* '740 Patent, 5:66–6:4; 6:52–55; 7:4–8. And although ST_CTL may act as a control signal, it is not generated in response to a reference signal and a feedback signal—unlike signal CTRL. Thus, circuit 120 is not a part of the necessary structure for "generating . . . a control signal in response to a reference clock signal and a feedback signal." The Court should not construe it to be corresponding structure to the claimed function.

## VII. CONCLUSION

For the foregoing reasons, the Court should adopt Liberty Patents' proposed claim constructions and reject Defendants' proposed claim constructions.

Dated: August 2, 2021

Respectfully submitted,

*/s/ Rehan M. Safiullah*
Matthew J. Antonelli
Texas Bar No. 24068432
matt@ahtlawfirm.com
Zachariah S. Harrington
Texas Bar No. 24057886
zac@ahtlawfirm.com
Larry D. Thompson, Jr.
Texas Bar No. 24051428
larry@ahtlawfirm.com
Christopher Ryan Pinckney
Texas Bar No. 24067819
ryan@ahtlawfirm.com
Rehan M. Safiullah
Texas Bar No. 24066017
rehan@ahtlawfirm.com

ANTONELLI, HARRINGTON
& THOMPSON LLP
4306 Yoakum Blvd., Ste. 450
Houston, TX 77006
(713) 581-3000

Stafford Davis
State Bar No. 24054605
sdavis@stafforddavisfirm.com
Catherine Bartles
Texas Bar No. 24104849
cbartles@stafforddavisfirm.com
THE STAFFORD DAVIS FIRM
815 South Broadway Avenue
Tyler, Texas 75701
(903) 593-7000
(903) 705-7369 fax

*Attorneys for Liberty Patents LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 2nd day of August 2021, I caused the foregoing to be served on counsel of record for Defendants in the above-listed cases by electronic mail.

*/s/ Rehan M. Safiullah*
Rehan M. Safiullah